# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ROBERT CALA, SR.,                          )
                                            )
        Plaintiff,                          )          Case No. 3:14-cv-01060
                                            )          Senior Judge Haynes
v.                                          )
                                            )
CAROLYN W. COLVIN,                          )
Acting Commissioner of Social Security,     )
                                            )
        Defendant.                          )

## MEMORANDUM

Plaintiff, Robert Cala, Sr., filed this action under 42 U.S.C. § 405(g) against the Defendant Carolyn Colvin, Acting Commissioner of Social Security, seeking judicial review of the Commissioner's denial of his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.

Before the Court is Plaintiff's motion for summary judgment (Docket Entry No. 17) contending, in sum, that the Administrative Law Judge ("ALJ") erred in finding Plaintiff was not disabled at step four; failing to consider Plaintiff's limited concentration, persistence, and pace issues, as well as Plaintiff's need for a cane and Plaintiff's limited ability to stoop. Plaintiff also challenges the ALJ's acceptance of the vocational expert's testimony. The Commissioner contends that the ALJ's decision is supported by substantial evidence.

After the evidentiary hearing, the ALJ evaluated Plaintiff's claim for DIB under the sequential evaluation process set forth at 20 C.F.R. § 404.1520. (Docket Entry No. 8, Administrative Record at 19-20).[1] The ALJ determined that Plaintiff met the insured status

---

[1]The Court's citations are to the pagination in the Administrative Record, not in the electronic case filing system.

requirements through December 31, 2017. Id. at 20. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 18, 2012, the alleged onset date. Id.

At step two, the ALJ determined that Plaintiff has the following severe impairments: post-traumatic stress disorder, knee arthritis, degenerative disc disease of the lumbar spine, osteoarthritis in the shoulder, obstructive sleep apnea, chronic plantar fasciitis, gouty arthritis, and permanent eye dryness. Id.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 20-23.

At step four, the ALJ determined that Plaintiff had the residual functional capacity to perform light work that includes lifting, pushing, pulling and carrying twenty pounds occasionally and ten pounds frequently, sitting, standing, and/or walking about six hours in an eight-hour work day, a requirement to sit and stand at will and to use a cane. Id. at 23-24. Plaintiff can occasionally climb ladders, ropes, and scaffolds, and can frequently reach with the left arm in front, laterally and/or overhead. Id. at 24. Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to eye dryness. Id. Plaintiff is limited to simple and detailed instructions, can maintain concentration, persistence, and pace for two hours at a time, and can relate appropriately with others, but would work better with things rather than with people, and can adapt to infrequent changes. Id.

At step five, the ALJ stated that Plaintiff is able to perform past relevant work as a general clerk. Id. at 29. The ALJ then found that Plaintiff is capable of performing jobs that exist in significant numbers in the national economy. Id. at 30-31. The ALJ concluded that

2

Plaintiff was not disabled within the meaning of the Act and was not entitled to DIB. Id. at 31.

After the ALJ's decision, Plaintiff requested a review. Id. at 7-14. On February 25, 2014 the

Appeals Council denied Plaintiff's request for review. Id. at 1-6.

## A. Review of the Record

On August 30, 2012, Plaintiff filed a claim for DIB, alleging an onset date of disability of

January 18, 2012. (Docket Entry No. 8 at 158-59). On December 4, 2012, Plaintiff's claim was

denied. Id. at 96-98. On February 4, 2013, Plaintiff requested reconsideration. Id. at 100. This

request was denied on June 17, 2013. Id. at 101-02. Plaintiff requested a hearing and one was

held on October 23, 2012 before ALJ Michelle Thompson. Id. at 37. The ALJ determined that

Plaintiff had not been under a disability between January 18, 2012 and the date of the decision,

November 13, 2013. Id. at 18.

Plaintiff was forty-eight years old at the time of his hearing. Id. at 41. Plaintiff has a

Bachelor's degree. Id. Plaintiff was a member of the United States Army and was deployed

twice to Iraq, where he saw combat. Id. Plaintiff was medically discharged from the Army in

March 2013 and had been taken off of active duty in January 2012. Id. at 41, 57.

Plaintiff's medical records predate his alleged onset date. On October 3, 2011, Plaintiff

visited the Army Medical Center with complaints of "worsening of [low back pain] [symptoms]

that are not responding to injections." Id. at 296-97. Plaintiff was evaluated for "worsening of

disc bulg vs tear and herniation in the L4-S1 regions[.]" Id. Plaintiff's previous MRI showed

"[m]ild bony/facet joint degenerative changes in the lumbar spine, but no significant disc based

pathology." Id.

On October 27, 2011, Plaintiff visited the Clarksville Pain Clinic ("CPC") for the first

3

time. Id. at 267-69. Plaintiff's "chief complaint" was "low back pain ... due to a work accident." Id. at 267. Plaintiff described his pain as "a constant, sharp, deep, aching, burning, stabbing, cramping, shooting pain." Id. Plaintiff also complained of radiating pain, numbness in his left leg, tingling in his wrists and weakness in his wrist. Id. At this visit, Plaintiff rated his pain a six on a scale of zero to ten. Id. Plaintiff stated that his pain was exacerbated by "sitting, bending or sleeping" but somewhat relieved by medication. Id. Plaintiff reported his treatment by a chiropractor for occupational therapy, physical therapy and pain management. Id. Plaintiff reported prior bilateral shoulder and knee surgeries. Id.

CPC's initial examination revealed that Plaintiff "has difficulty straightening his back during this visit," with "burning pain in bilateral legs" and "[m]oderate muscle spasms." Id. at 268. The CPC physician noted that although Plaintiff brought an MRI dated October 17, 2011, those results did "not explain his sensory symptoms." Id. at 269. The CPC physician prescribed a nerve conduction study, lumbar epidural steroid injections and a TENS unit, and planned to "consider getting an arthritis panel if [Plaintiff] continues to have the same symptoms after the injection series. Id. Plaintiff underwent several tests on this visit. Id. at 274-78. The results reflect that "[a]ll nerve conduction measurements with reference ranges were within normal limits," and that Left L5/S1 and Right L5/S1 radiculopathy was unlikely. Id. at 274.

On November 4, 2011, Plaintiff returned to CPC. Id. at 270-73. The CPC physician found that Plaintiff's "right ulnar (Wrist to ADM) CMAP amplitude is outside normal limits" and that Plaintiff's "right peroneal (Ankle to EDB) A wave is outside normal limits." Id. at 270. The CPC physician also found "[n]on-specific low right ulnar motor amplitude" and "[n]on-specific F-wave abnormality on right, [that] may indicate L5/S1 radiculopathy, but that

4

"[p]olyneuropathy [was] unlikely." Id. at 271.

Plaintiff received the lumbar epidural steroids on October 28, 2011 and November 4, 2011. Id. at 265-66. On December 14, 2011, Plaintiff received another lumbar epidural steroid and rated his pain at a five out of ten with medication and a nine out of ten without medication. Id. at 263-64. Plaintiff reported constant pain and a depressed mood. Id. On December 21, 2011, Plaintiff returned to CPC citing constant lower back pain that he rated a five out of ten with medication and a ten out of ten without medication. Id. at 262. On January 14, 2012, Plaintiff returned to CPC with complaints of lower back pain rated at a "2 3 4" with medication and a "9 10" without medication. Id. at 261.

Plaintiff's alleged onset date of disability is January 18, 2012. On January 18, 2012, Plaintiff visited Blanchfield Army treatment facility for an ultrasound. Id. at 701-02. Plaintiff had been diagnosed with bilateral plantar fasciitis and had been treated previously in January 2011. Id. at 701.

On January 25, 2012, Plaintiff's commander evaluated Plaintiff with a performance and functional statement. Id. at 144-46. Plaintiff's commander cited several issues, including that "[s]oldier's medical conditions/limitations affect unit accomplishing mission;" "I do not recommend retaining this Soldier: SM is [severely] limited by his physical capabilities;" and Plaintiff "occasionally makes (or avoid making) unreasonable complex or unfamiliar decisions: SM is not in a position to make complex decisions." Id. at 146.

On January 25, 2012, Plaintiff visited the Flight Medicine Army treatment facility. Id. at 609-16. It was noted that Plaintiff "has multiple encounter[s] without follow up. He is agreeable to treatment, but fails to follow up. [Plaintiff] is variable when reporting symptoms appearing to

5

over report at times, and downplay at others depending on situations outside of clinic." Id. at 612. At this visit, Plaintiff rated his pain at an eight out of ten. Id. at 614.

On February 1, 2012, Plaintiff visited the Army Medical Center for right foot pain and an evaluation of the radiographs conducted on January 6, 2012. Id. at 292-93. The radiographs showed "[n]o acute fracture," but did show "[v]ascular calcinosis." Id. at 293. Also on February 1, 2012, Plaintiff received a pre-operative consult for orthotripsy for plantar fasciitis scheduled for February 3, 2012. Id. at 697-700. The procedure was intended to "break[] up scar tissue and increase[] blood flow to the area." Id. at 699. Plaintiff was advised that in twelve to fourteen weeks, approximately eighty-five percent of patients experienced ninety-five and one hundred percent pain relief. Id.

On February 6, 2012, Plaintiff visited Blanchfield Army treatment facility for treatment of bilateral plantar fasciitis. Id. at 608. Plaintiff requested a surgical option because previous treatments had been ineffective. Id. Plaintiff received anesthesia and his feet were shocked with electricity, "[a] total of 3000 shocks, 1500 per foot, was administered at a maximum kV of 18." Id.

On February 7, 2012, Plaintiff returned to the Army Medical Center, complaining of pain. Id. at 288-92. Plaintiff had several tests and evaluations performed. Id. Plaintiff underwent a chest x-ray that was normal. Id. at 292. Plaintiff's left ankle was examined and displayed a "bony ossicle projecting in the dorsal aspect of the calcaneal bone. Moderate calcification is noted at the insertion of the Achilles tendon." Id. at 291. Plaintiff's right hand showed "[m]inor degenerative patterns of the distal interphalangeal joint of 4th digit." Id. at 288. Plaintiff's right hip and right thumb were evaluated, but were found to be normal. Id. at 288-89. Plaintiff's left

knee showed no changes when compared to radiographs from December 2010. Id. at 290. Plaintiff's left elbow presented an "olecranon bone spur" that "may be partially separated." Id. at 290-91.

On February 10, 2012, Plaintiff returned to CPC. Id. at 260. Plaintiff reported lower back pain that he now claimed had bothered him for four years. Id. Plaintiff complained of constant pain that he rated as a three out of ten with medication and an eight out of ten without medication. Id. Plaintiff had an improved mood and "tolerable" pain. Id. Plaintiff was prescribed a TENS unit, backbrace, as well as medication for his pain. Id.

On February 11, 2012, Plaintiff returned to CPC reporting that his pain was tolerable and his mood improved. Id. at 554. Plaintiff stated that he was using a TENS unit and a backbrace. Id.

On February 14, 2012, Plaintiff was evaluated for a "compensation and pension physical examination." Id. at 746-60. Plaintiff's past surgeries were noted as "Right shoulder arthroscopy, 2000 Left shoulder arthroscopy, 2006 Left knee meniscectomy, 2008 Colonoscopy, 2009 Upper endoscopy, 2009 Bilateral Orthotripsy, 2012." Id. at 747. Plaintiff described twenty-three physical complaints. Id. at 747-51. The examiner noted that Plaintiff had a "normal" gait "with no ambulatory aids utilized." Id. at 751. During a musculoskeletal examination, Plaintiff did not demonstrate "objective evidence of painful motion." Id. at 752. This examination found "[n]o functional loss and/or functional impairment" and "[n]ormal muscle strength." Id. The thoracolumbar spine examination also found "[n]o objective evidence of painful motion," but noted that Plaintiff experienced "[w]eakened movement," "[e]xcess fatigability" and "[p]ain on movement." Id. at 753. The pain and muscle testing showed

"[l]ocalized tenderness or pain to palpation" but no muscle spasms or muscle atrophy. Id.

Plaintiff did not demonstrate objective pain or loss of functional strength in the remaining examinations. Id. at 753-57.

Plaintiff was diagnosed with twenty-seven conditions: mild degenerative lumbar spine disease; left shoulder status post orthopedic surgery with retained hardware; right shoulder status post resection distal end of right clavicle; left patella chondromalacia; right patellar chondromalacia, status post surgical intervention; benign hypertension; bilateral plantar fasciitis with bilateral posterior calcaneal bone spurs; right foot mild pes planus; bilateral achilles tendinitis with enthesophyte formation left ankle; mild sleep apnea that does not require a CPAP; gastroesophageal reflux disease; internal hemorrhoids by history, external hemorrhoid noted on exam; migraine vs. tension headaches; mild intrinsic asthma with no residual findings on examination; left elbow olecranon bone spur; gouty arthritis bilateral feet; mild right maxillary chronic sinusitis; pseudofolliculitis barbae, normal examination with no residual scarring; right hip strain; pineguecula, bilateral eyes; anxiety disorder not otherwise specified; and insomnia; but no residual or chronic condition of right thumb fracture, left ankle sprain, costochondritis, or cervicalgia. Id. at 758-60.

On February 15, 2012, Plaintiff visited the Army Medical Center. Id. at 287-88. Plaintiff presented for evaluation of his right foot that had swelling and gout. Id. at 287. The report concluded that the right foot examination was "[e]ssentially negative," but noted that Plaintiff's right foot had "tiny posterior calcaneal spurs bilaterally," a "plantar arch [that] is low," and "a small oval 4 mm diameter foreign body on the skin or in the subcutaneous soft tissues just lateral to the distal metaphysis the left metatarsal with no counterpart on the right." Id. at 288.

On February 22, 2012, Plaintiff had an eye examination conducted as part of Plaintiff's application for Department of Veterans Affairs ("VA") disability benefits. Id. at 726-46. Plaintiff had previous diagnoses of pinguecula, photophobia and floaters. Id. at 727. At this examination, it was noted that Plaintiff had pinguecula conjunctivitis and vitreous floaters. Id. at 735, 737 and 744. Plaintiff's condition did not impact his ability to work. Id. at 745.

On February 27, 2012, Plaintiff visited Blanchfield Army treatment facility for treatment of gout. Id. at 605-07. Plaintiff was "in need of dietary and lifestyle modifications to improve overall lipid profile and symptoms of gout." Id. at 606.

On February 28, 2012, Plaintiff was evaluated for "mental disorders (except [post-traumatic stress disorder ("PTSD")] and eating disorders," although on the accompanying form Plaintiff is noted as having "a diagnosis of PTSD that conforms to [Diagnostic and Statistical Manual of Mental Disorders, 4th edition ("DSM-IV")] criteria based on [this] evaluation." Id. at 716-25. Plaintiff did not have more than one mental disorder diagnosis and did not have a diagnosis of traumatic brain injury. Id. at 718. In the section for occupational and social impairment, Plaintiff was marked as "[o]ccupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood." Id. at 719. This second-highest level of impairment is just below "[t]otal occupational and social impairment." Id. Plaintiff reported that he "[did] not think the medicine is helping" and that he "is worried about his relationship with his family." Id. at 721.

Several factors were considered to support Plaintiff's diagnosis of PTSD. Id. at 722-25. First, Plaintiff had a noted stressor of "[i]dentified bodies of dead soldiers" that was "adequate to support the diagnosis of PTSD" and was "related to the Veteran's fear of hostile military or

terrorist activity." Id. at 722. Under DSM-IV Criterion A, Plaintiff had "been exposed to a traumatic event where: [t]he Veteran experienced, witnessed or was confronted with an event that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others" and "[t]he Veteran's response involved intense fear, helplessness or horror." Id. at 723.

Under Criterion B, the event was "persistently re-experienced" in "[r]ecurrent and distressing recollections of the event, including images, thought or perceptions," "[r]ecurrent distressing dreams of the event," "[a]cting or feeling as if the traumatic event were recurring," "[i]ntense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event" and "[p]hysiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event." Id.

Under Criterion C, Plaintiff experienced "[p]ersistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (not present before the trauma), as indicated by" "[e]fforts to avoid thoughts, feelings, or conversations associated with the trauma," "[e]fforts to avoid activities, places or people that arouse recollections of the trauma," "[m]arkedly diminished interest or participation in significant activities," "[f]eeling of detachment or estrangement from others," and "[r]estricted range of affect." Id. at 723-24.

Under Criterion D, Plaintiff demonstrated "[p]ersistent symptoms of increased arousal, not present before the trauma, as indicated by" "[d]ifficulty falling or staying asleep," "[i]rritability or outbursts of anger," "[d]ifficulty concentrating," "[h]yperviligance," and "[e]xaggerated startle response." Id. at 724.

Under Criterion E, "[t]he duration of the symptoms described above in Criteria B, C and

D is more than 1 month." Id.

Finally, in Criterion F, it was noted that "[t]he PTSD symptoms described above cause clinically significant distress or impairment in social, occupational, or other important areas of functioning." Id. The report listed several symptoms associated with PTSD experienced by Plaintiff. Id. at 724-25.

On April 22, 2012, Plaintiff returned to CPC. Id. at 259. Plaintiff reported that his "physical function" was worse, although his mood was improved. Id. Plaintiff stated that his prescribed medication was not helping his pain, and he was also using both a TENS unit and a backbrace. Id.

On May 11, 2012, Plaintiff returned to CPC citing constant, but improved, pain and a pleasant mood. Id. at 544. Plaintiff rated his pain as a three out of ten with medication and a nine out of ten without medication. Id. Plaintiff reported using both his TENS unit and his backbrace. Id.

On August 6, 2012, proceedings were held by the United States Army Physical Disability Agency's Physical Evaluation Board ("PEB"). Id. at 147-57. The PEB concluded that "[Plaintiff was] physically unfit and recommend[ed] a rating of 80% and that the [Plaintiff's] disposition be placed on [Temporary Disability Retirement List] and with a reexamination during 07/2013." Id. at 147. Plaintiff's first disability was listed as PTSD. Id. The PEB found Plaintiff's PTSD diagnosis to be "appropriate" and that it "requires ongoing psychotropic medication." Id. The PEB found that this condition made Plaintiff unfit "because it renders the [Plaintiff] unable to reasonably continue military service due to irritability, depressed mood, anxiety, panic attacks, sleep difficulty, avoidance symptoms, hypervigilance, and exaggerated startle response." Id.

As to Plaintiff's second listed disability, lumbar myofascial pain syndrome, the PEB determined Plaintiff to be unfit "because it renders the [Plaintiff] unable to perform military functional activities and would create an unreasonable risk to the [Plaintiff's] health with continued exposure to the rigors of military service." Id.

The PEB also found Plaintiff's third listed disability, left shoulder arthritis, "associated with disorder of the opposite shoulder," to render Plaintiff unfit "because it renders the [Plaintiff] unable to perform military functional activities and would create an unreasonable risk to the [Plaintiff's] health with continued exposure to the rigors of military service." Id.

Plaintiff's fourth listed disability was "right shoulder, status post resection of distal right clavicle." Id. The PEB found this condition was "associated with disorder of the opposite shoulder." Id. The PEB found this condition rendered Plaintiff unfit "because it renders the [Plaintiff] unable to perform military functional activities and would create an unreasonable risk to the [Plaintiff's] health with continued exposure to the rigors of military service." Id.

Plaintiff's fifth listed disability was "right patellar chondromalacia status post surgical intervention." Id. at 148. This condition was "associated with lumbar disorder and left knee disorder." Id. The PEB found this condition rendered Plaintiff unfit "because it renders the [Plaintiff] unable to perform military functional activities and would create an unreasonable risk to the [Plaintiff's] health with continued exposure to the rigors of military service." Id.

Plaintiff's sixth disability was "left patellar chondromalacia," "associated with lumbar disorder and right knee disorder." Id. The PEB found this condition rendered Plaintiff unfit "because it renders the [Plaintiff] unable to perform military functional activities and would create an unreasonable risk to the [Plaintiff's] health with continued exposure to the rigors of military

service." Id.

Plaintiff originally submitted twenty-five proposed disabilities, both service-related and non-service related. Id. at 149-52.

On September 12, 2012, Plaintiff's supervisor was asked to complete a work activity questionnaire because SSA suspected Plaintiff had engaged in an unsuccessful work attempt. Id. at 160-64. The supervisor answered "no" to the following questions: "[d]oes the employee complete all the usual duties required for his/her position?" "[i]s the employee able to complete all of the job duties without special assistance?" and "[o]n average, does the employee complete his/her work in the same amount of time as employees in similar positions?" Id. at 163. The supervisor stated that Plaintiff "regularly report[ed] for work as scheduled." Id. As to "special assistance," the supervisor checked that he allowed Plaintiff "fewer or easier duties," "more breaks/rest periods," "frequent absences" and "extra help/supervision" that he did not regularly allow other employees. Id. The supervisor reported that Plaintiff had a productivity level of "50% or less of other employees' productivity." Id. at 164. As to unsuccessful work attempts, the supervised stated that Plaintiff was not frequently absent from work and did complete work in a satisfactory manner, but that Plaintiff completed his work with the special conditions noted previously. Id.

On September 13, 2012, Plaintiff completed a work activity report for SSA. Id. at 179-90. Plaintiff wrote that he was "required to call in only for accountability purposes" but was not "required to go to work." Id. at 187. Plaintiff reported income from the Army, and stated that he "[continues] to receive [his] military base pay pending results of a medical review board." Id.

On September 17, 2012, Plaintiff visited Blanchfield Army treatment facility for a behavioral health consultation. Id. at 687-91. Plaintiff presented with "frustration; sleep problems; headaches"

and wanted to address them with "sleep lab; neurology." Id. at 689. Plaintiff's chief complaint was "frustration at not getting physical needs met and appeal of [Medical Evaluation Board]." Id. at 690. After this appointment, Plaintiff "chose not to schedule follow up" with another behavioral health appointment. Id. at 689.

On September 17, 2012, Plaintiff also visited Care Chiropractic. Id. at 279-80. Plaintiff demonstrated tenderness, myospasm and trigger points bilaterally in his lower paraspinals, lumbar paraspinals, piriformis and gluteals. Id. at 279. Plaintiff had a restricted range of motion in his left and right lower extremities. Id. Plaintiff was also noted to have weakness and abnormality in his toe walk. Id.

On September 18, 2012, Plaintiff visited the Army Medical Center for evaluation of bilateral heel pain. Id. at 287. The report showed "[p]osterior calcaneal bone spurs ... bilaterally" but "[n]o fractures, bone destructive processes or dislocations." Id.

On September 18, 2012, Plaintiff was also treated for a right thumb fracture. Id. at 715. The examination showed "[n]o objective pain" and "[n]o limitations in range of motion from pain, fatigue, weakness or lack of endurance with repetitive use." Id.

On September 19, 2012, Plaintiff visited the Aviation Medicine Clinic Army treatment facility. Id. at 684-86. Plaintiff presented with complaints of sleep apnea, degenerative disc disease and resulting shoulder and knee pain, and requested a neurology consultation for headaches and refill of his prescriptions. Id. at 685.

On September 19, 2012, Plaintiff visited Crow Chiropractic for treatment of low back pain. Id. at 560-61. Plaintiff reported pain at a seven out of ten. Id. at 560. Dr. Crow noted that this level of "[i]ntensity is un-changed." Id. at 560. On September 24, 2012, Plaintiff returned to Crow

14

Chiropractic. Id. at 562-63. Plaintiff "reports that he continues to have constant (up to 100% of day) sharp pain located in left low back, right low back" and reported pain at a six out of ten. Id. at 562. Plaintiff was treated with chiropractic manipulative therapies and mechanical traction. Id.

A September 26, 2012 "substantial gainful activity determination" report produced by the SSA reflected that an "evaluation of work activity [was] required" and in the comments was written "[Plaintiff's] unit commander completed the SSA-3033 and [stated] [Plaintiff] stopped work 01/06/2012. Further, the unit commander states [Plaintiff] had fewer or easier duties, more rest periods, frequent absences, and extra help/supervision. The unit [commander] states that [Plaintiff] works at 50% [or] less of other employees' productivity. The unit DCR completed a commander's performance evaluation of the [Plaintiff] in which he does not recommend the [Plaintiff] to be retained on active duty due to [Plaintiff's] inability to perform physical tasks." Id. at 191-94.

On October 16, 2012, an MRI was performed on Plaintiff. Id. at 842-43. On October 18, 2012, Plaintiff attended a consultation to review the results of the MRI on his left foot. Id. at 602-04. The MRI showed "[m]ild plantar fasciitis in the medial fascicle," "[s]mall tibiotalar and first metatarsal phalangeal joint effusions," and "probably distal posterior tibialis tendinosis." Id. at 602.

On October 26, 2012, Plaintiff visited the Blanchfield Army treatment facility for treatment of gout. Id. at 672-83. The physician confirmed Plaintiff's gout through blood and urine tests. Id. at 676. Plaintiff also complained of hypertension, migraines, asthma, joint pain and muscle spasms. Id. at 679.

On October 26, 2012, Plaintiff also visited the flight medicine Army treatment facility. Id. at 591-600. Plaintiff was initially referred for "L-spine [disc degenerative disorder] and patellar chondromalacia and with [many] other medical problems." Id. at 591. Plaintiff underwent a

physical examination and was treated for management of gout. Id. at 591-96. Plaintiff reported

migraines, joint pain and muscle spasms and a history of asthma, gout and hypertension. Id. at 596-

97. Plaintiff was advised to change some of his medications, including colchicine, a medication used

for "pain control" that Plaintiff had apparently been using "to bring down uric acid level" to treat his

gout. Id. at 597.

On October 26, 2012, Plaintiff also visited CPC. Id. at 555. Plaintiff received a medial

branch block, and the procedure had no complications. Id. On November 12, 2012, Plaintiff

returned to CPC. Id. at 553. Plaintiff received another medial branch block and did not experience

complications. Id.

On November 13, 2012, Plaintiff's DIB claim was denied by the ALJ. Plaintiff requested

review of this decision. On November 20, 2012, Plaintiff was evaluated by Disability Determination

Services. Id. at 536-40. E-Ling Cheah, clinical psychologist, performed a clinical interview and

reviewed records provided by Plaintiff from January 27, 2012 and September 17, 2012. Id. at 536.

Plaintiff reported that he had "never had any periods of inpatient hospitalization for mental health

problems" but that "he has had mental health treatment through the military for 'PTSD' for the past

two years." Id. at 537. Plaintiff reported that "medication management and therapy is 'sometimes'

helpful." Id. Dr. Cheah noted that Plaintiff "has been inconsistent with follow up with treatment."

Id. Plaintiff denied homicidal or suicidal ideation, but described hallucinations of shadows and

"'think[ing] somebody's coming after [him],'" that Dr. Cheah described as "delusional thinking."

Id.

Dr. Cheah wrote that Plaintiff "appears to fall into the average range of intellectual

functioning. He states he has some problems with his short-term memory and concentration

abilities. He reports that some typical examples of these difficulties include: 'I can't remember something if I read it or see it.'" Id. at 538. In conclusion, Dr. Cheah wrote, "[Plaintiff] showed no evidence of short-term memory impairment. He showed evidence of mild impairment in his ability to sustain concentration. He showed no evidence of impairment in his long-term and remote memory functioning. His current psychiatric state was irritable and depressed. He shows evidence of a mild impairment in his social relating. He appears to be mildly impaired in his ability to adapt to change. He appears able to follow instructions, both written and spoken." Id. at 539.

On November 26, 2012, December 3, 2012 and December 10, 2012 Plaintiff returned to the CPC. Id. at 551, 550, 549. At each of these appointments, Plaintiff received medial branch blocks and did not experience complications. Id.

On December 7, 2012, Plaintiff was treated for plantar fasciitis and tendonitis. Id. at 587-90. Plaintiff reported that this condition had begun in 2004. Id. at 588. Plaintiff reported that it was aggravated by "running, prolonged [weight bearing], rising from sitting prolonged, running, jumping/side straddle hop" and eased by "ice, rest, lying down / sit down." Id. At the time, Plaintiff's long term goals were to "[i]nitiate walk run program, return to pushups, pass next [Army Physical Fitness Test]." Id. at 589.

On January 15, 2013, Plaintiff visited the Blanchfield Army treatment facility for physical therapy. Id. at 670-71. Plaintiff arrived late "due to an accident," but "finished what he could." Id. at 671. Plaintiff rated his pain as a five out of ten on the right and a three out of ten on the left both before and after physical therapy. Id. at 670, 671.

On January 23, 2013, Plaintiff visited CPC for a follow up. Id. at 960. Plaintiff reported constant pain, an unchanged pain level, and unchanged physical functioning level. Id. On January

30, 2013, Plaintiff returned to the Clarksville Pain Clinic for a follow up. Id. at 959. Plaintiff reported that his pain level and physical functioning were worse. Id.

On January 31, 2013, Plaintiff underwent a chest posterior-anterior and lateral series. Id. at 568. Plaintiff's "lungs are normal in appearance, with no evidence of active disease." Id. On February 1, 2013, Plaintiff visited the Blanchfield Army treatment facility for repair of an orthopedic device. Id. at 669.

On February 4, 2013, Plaintiff completed a disability report for his appeal. Id. at 206-13. Plaintiff cited changes in his condition that he specified as "Sleep Apnea: A CPAP Machine has been prescribed and incorporated in my diary leaving. Chronic Plantar Fasciitis: unable to stand for period of time longer than 30 minutes or walk long distances. Permanent wearing orthopedic inserts. Post Traumatic Stress Disorder (PTSD): lack of concentration and/or depression, helplessness, anxiety. Myofascial Pain radiates to bilateral legs causing numbness and tingling. Unable to drive long distances or for long period of time. Acute Gout Arthritis: petit attacks on bilateral foot causing severe joint pain, chills, fever, loss of appetite and disco[m]fort. Pingueculae Disease: permanent dryness and eyes irritation." Id. at 206.

Plaintiff also stated that he had new limitations that he specified as "Sleep Apnea with CPAP prescribed unable to sleep without the help of CPAP machine. Chronic Plantar Fasciitis: unable to stand-up for period longer than 30 minutes, wear shoes without prosthetic inserts. Post Traumatic Stress Disorder (PTSD): concentration problems, unable to hold memories for longer periods of times. Numbness and Sleeping Legs: impaired the driving due to legs numbness can be exposed to UV light for long period of time. Unable to wear normal shoes due to foot inflamation." Id. at 206-07.

18

On the final page in additional comments, Plaintiff wrote, "[s]till don't understand why my first application was denied, since 2006 I'm suffering for a long disability that following my Doctors professional opinion most of them or all are permanent illness. I've been feel hopeless and exhausted from this process but need to continue the fight due to the lack of income and the need of support my family." Id. at 212.

Plaintiff also answered yes when asked whether he had a new illness, but wrote "[i]t's like I have been condemned to a suffering leaving, the pleasure of doing things like I used to or hanging in places with my family is no longer there. Some times bad thoughts invade my main and make change from a peaceful stage to a very ungraceful one causing discomfort to my closed family members. I'm willing to do my best in way to better myself, but some times I think could be there no been here no more instead of being begging for help to support myself." Id. at 207.

On February 11, 2013, Plaintiff completed a pain questionnaire. Id. at 216-19. Plaintiff reported "lower back, knees, shoulders" pain that began "about 10 yrs. ago." Id. at 216. Plaintiff reported that his pain "first beg[a]n to affect activities" "about a year ago." Id. at 217. Methods that Plaintiff used to relieve the pain included "back brace, TENS unit, stretching unit, knee brace" and "stretching, massaging, hot pads, cold pads, rest." Id.

On February 11, 2013, Plaintiff also completed a fatigue questionnaire. Id. at 220-21. According to Plaintiff, he normally went to sleep between 11:30PM and midnight and awoke between 3AM and 4AM. Id. at 220. Plaintiff reported several areas that he needed help with: "dressing in the morning, cleaning, tying [his] shoes," preparing and cooking meals and "carrying the goods to the car, sometimes driving" when shopping. Id. Plaintiff stated that he could be on his feet for thirty minutes before needing to rest for fifteen to twenty minutes. Id. at 221. Plaintiff

19

reported that his condition keeps him from working because he was "unable to perform any physical task without pain and/or sit or stand," and that he was "unable to concentrate or be on time at any place due to the lack of sleep." Id.

On February 11, 2013, Plaintiff also completed a function report. Id. at 222-29. Plaintiff stated that he was limited in his ability to work because "the lumbar myofascial pain syndrome has caused impairment of the motor function in [his] lower extremities which limits [his] functional abilities of motions and neck stiffnes[s]. [He] can't bend, [squat], kneel, reach or lift because of both (back and knee), [he's] having slight vertigo and numbness on both legs which periodically cause cramps that last for hours. The lack of sleep affect[s] [his] judgment, mood, ability to learn and retain information." Id. at 222. Plaintiff stated that he needed assistance in every aspect of personal care, to take care of personal needs and grooming, and to take medicine. Id. at 223-24. Plaintiff reported problems getting along with family members because he "feel[s his] depressive mood is offensive to others and that [he] can affect them with my emotional problems." Id. at 227. Plaintiff listed several physical limitations, and specifically wrote that he was limited to "lifting: 25lbs, no squat[t]ing, no bending, no standing more than 30 minutes, no reaching above head, walk 1/4 mile, sitting for 30 minutes, no kneeling, ringing noise [right] ear, climbing 2 floor, eye itch when expose to sun, hard to remember tasks, exhaust." Id. At the time, Plaintiff did not indicate that he was using a cane, although he did mark that he was using a hearing aid, a brace/splint, and glasses/contact lenses. Id. at 228.

On February 23, 2013, Plaintiff underwent a radiologic examination of his intervertebral spine. Id. at 710-11. The exam showed "[n]o evidence of disc desiccation or tears of annulus fibrosis" and the disc level axial analysis showed "[n]o significant disc pathology present." Id. at

710.

On April 18, 2013, Plaintiff visited The People's Clinic. Id. at 869-71. This was Plaintiff's initial visit to the facility. Id. at 869. Plaintiff's physical complaints were: hypertension, GERD, migraine with aura, gout, asthma, shoulder pain, lower back pain, knee pain, noise-induced hearing loss, and chronic insomnia. Id. Plaintiff was scheduled for a radiofrequency ablation on L3-5. Id. at 871.

On April 24, 2013, Plaintiff visited Comprehensive Pain Specialists for the scheduled radiofrequency ablation. Id. at 832-34. Plaintiff presented "with long history of [lower back pain] [status post] medial branch blocks with reported significant response[.]" Id. at 832. Plaintiff reported his pain as "sharp stinging numb" and "constant," "made worse by lying on back sitting changing from sitting to standing bending or stooping walking lifting or carrying small loads." Id. Plaintiff was administered the first of two lumbar radiofrequency neurotomy injections, and "tolerated the procedure well." Id. at 833. On May 1, 2013, Plaintiff returned to The People's Clinic for medication refills. Id. at 865-68. Plaintiff was also referred to a gastroenterologist. Id. at 867.

On May 6, 2013, Plaintiff visited CPC complaining of pain in his back and knees. Id. at 963. Plaintiff described his pain level as tolerable and his mood improved. Id.

On May 7, 2013, Plaintiff visited Clarksville Physician Services regarding gastro-esophahgeal reflux disease. Id. at 819-21. Reflux was "noted [by Plaintiff] 13 years ago, occurs intermittently," and Plaintiff had an "[i]ncrease in [symptoms] over past 2 [weeks]." Id. at 819. The physician recommended a esophago-gastro-duodenoscopy. Id. at 821. This procedure was performed on May 22, 2013. Id. at 822. The stomach, esophagus and duodendum all "appeared normal." Id. Plaintiff was advised to continue with his current medications and return for a follow

up. Id.

On May 8, 2013, Plaintiff visited Comprehensive Pain Specialists. Id. at 826-28. Plaintiff presented for a follow up and to receive a second lumbar radiofrequency neurotomy. Id. at 826. Plaintiff stated that the first neurotomy was successful, so much so that "he does not feel as if needs [pain medication] at this point in time." Id.

On May 17, 2013, Plaintiff underwent a psychiatric assessment. Id. at 760-67. At this appointment, Plaintiff stated that he was "looking for a counselor on how to manage [his] sickness, it has been making [him] feel worse." Id. at 760. Plaintiff reported "[i]nsomnia, nightmares, avoidance of crowds, irritability, hypervigilance, easy startle." Id. Plaintiff also claimed he has "never tried medicine." Id. At this point, Plaintiff was still hearing voices that called his name and seeing shadows. Id. at 762. It was noted that Plaintiff suffered from depression, and Plaintiff's depression was also scored using a patient health questionnaire screen that was suggestive of moderate depression. Id. at 762-63.

The psychiatrist noted that: "Patient seen briefly in the ED. He denies [suicidal ideation]/[homicidal ideation], and notes that he just wanted to speak with someone in mental health to get into the system for treatment of PTSD and depression. He reports that he has been taking amitriptyline [an anti-depressant] for awhile, but that it tends to be oversedating. He has never tried any SSRIs. He does not feel that his therapy in Clarksville is helpful, and is interested in referral to the PTSD clinic here in Nashville." Id. at 765.

On May 22, 2013, Plaintiff visited Comprehensive Pain Specialists. Id. at 823-25. Plaintiff reported that after his lumbar radiofrequency neurotomy, he was experiencing 65% overall relief. Id. at 823. Plaintiff reported that he could not lie flat to sleep due to pain, and the Nurse Practitioner

Rebekah Ruth Pierce discussed sleep positions that Plaintiff agreed to try. Id. Plaintiff described his pain as constant and "sharp stabbing stinging numb," but rated his pain a four out of ten most of the time. Id. According to Plaintiff, his pain worsened by lying on his side and his back, by changing from sitting to standing, and by bending, stooping, lifting and carrying heavy loads. Id.

On May 28, 2013, Plaintiff visited the VA Hospital for "post-deployment transition." Id. at 935-39. On this visit, Plaintiff presented an "extensive list of chronic medical problems." Id. at 935. The VA hospital report reflects that Plaintiff needed "to restart his meds for hypertension but also his other chronic medications for the chronic back and knee and foot pain" and needed to "get established in gastroenterology in the VA system." Id. This VA report stated that Plaintiff has "90% service-connected disability but is pursuing already the appeals to be established as 100% service-connected disabled." Id. at 936.

On June 4, 2013, Plaintiff visited The People's Clinic. Id. at 861-64. Plaintiff was present for a follow up visit regarding his gout, GERD, hypertension and knee pain. Id. at 861. Plaintiff was prescribed new refills, an increased strength of allopurinal for gout, and lortab for pain. Id. at 863.

On June 7, 2013, Plaintiff visited CPC for a bilateral sacroiliac joint injection. Id. at 962. Plaintiff had no complications and was discharged with use of his cane. Id. On June 14, 2013, Plaintiff visited CPC for another bilateral sacroiliac joint injection Id. at 961. Plaintiff did not experience any complications and was discharged with use of his cane. Id.

On June 17, 2013, Plaintiff visited STAR Physical Therapy for an initial evaluation. Id. at 1007-13. Plaintiff complained of "pain, stiffness, tingling" upon standing and "difficulty with transitional movements." Id. at 1009. Plaintiff's treatment plan included twice weekly visits for six weeks. Id. at 1007. On June 19, 2013, Plaintiff returned to STAR Physical Therapy and reported

"overall decent tolerance" of his home exercise program and tolerated treatment well. Id. at 1005-06.

On June 24, 2013, Plaintiff visited STAR Physical Therapy "report[ing] an overall decrease in pain/symptoms since the initiation of therapy." Id. at 1003-04. Plaintiff tolerated treatment well, and the evaluator "would like to[ ]see if there are ways we can improve independence with ambulation maybe even without cane .. if feasible .. need to discuss with patient." Id. On June 26, 2013, Plaintiff returned to STAR Physical Therapy. Id. at 1001-02. Plaintiff "complain[ed] of increased pain/symptoms since the last visit." Id. at 1001. Plaintiff "tolerated treatment well today" but was "progressing slower than expected toward treatment goals." Id.

On June 28, 2013, Plaintiff visited the VA Hospital for an initial assessment of PTSD. Id. at 924-30. The purpose of the visit was to assess whether Plaintiff was "appropriate for evidence-based psychotherapy for PTSD." Id. at 925. Plaintiff was "frustrat[ed] with 'the system' and the military reporting that he has not been given proper help or assistance he feels he needs." Id. Plaintiff also "report[ed that] discharge from the military due to physical/mental health conditions was very difficult and 'not [his] plan.'" Id. Plaintiff recounted several traumatic events that occurred during his deployments. Id. at 927. Plaintiff completed two self-reports and scored "in the severe range" on both, "an indication that criteria for PTSD is met." Id. at 929.

On July 3, 2013, Plaintiff visited the VA Hospital for medication management. Id. at 919-922. Plaintiff was using a cane to walk at the time. Id. at 921. Plaintiff stated that his prescriptions for fluoxetine and zolpidem were both "helping [him]." Id. at 920. Plaintiff reported that it was difficult to fall asleep due to hypervigilance, and also stated that he experienced migraines but could not get in contact with his primary care physician regarding this issue. Id. Plaintiff's fluoxetine

24

prescription dosage was increased, and he was referred to a polytrauma clinic and to a PTSD clinic. Id. at 922.

On July 5, 2013, Plaintiff visited STAR Physical Therapy. Id. at 999-1000. Plaintiff was "progressing well as evidenced by decreased pain level, improving functional ability and improved lumbar [range of motion]. [Plaintiff was] making good gains with core strengthening[.]" Id. at 999.

On July 10, 2013, Plaintiff visited The People's Clinic for a checkup. Id. at 859-60. Plaintiff's gout was assessed and he reported taking eighteen medications. Id. at 860.

On July 27, 2013, Plaintiff completed a disability report for his appeal. Id. at 232-39. Plaintiff wrote that his "PTSD has worsened, feel afraid for own safety and surrounding. Unable to drive due to drow[s]iness effect of medications, spasms and numbness on both legs, more frequent reflux attack." Id. at 232. Plaintiff also wrote that he "[has] PTSD and suffering from extreme anxiety and emotion disturbance that [interferes] with [his] ability to concentrate, have a social life and ability to drive. [He] also [has] degenerative disc [disease] and it has gotten so [severe] that [he] can't walk well anymore." Id. at 237.

On August 14, 2013, Plaintiff visited STAR Physical Therapy but could not be evaluated "due to patient's non-compliance with [physical therapy/occupational therapy] program. [Plaintiff] did not attend therapy as advised[.]" Id. at 998.

On August 16, 2013, Plaintiff attended his first group therapy session for PTSD at the VA Hospital. Id. at 904-05. Plaintiff was given a suicide risk assessment and was not found to be a suicide risk. Id. at 904.

On August 22, 2013, Plaintiff visited The People's Clinic. Id. at 855-58. Plaintiff reported eye pain, knee pain and lower back pain. Id. at 855. During the physical examination, Plaintiff

showed a slowed gait with use of a cane, pain with range of motion during left knee flexion, extension, and internal and external rotation, and tenderness upon palpation. Id. at 857. Plaintiff was referred to an opthamologist, an orthopedist and STAR Physical Therapy, and scheduled for a follow up. Id. at 858.

On August 23, 2013, Plaintiff attended his second group therapy session for PTSD at the VA Hospital. Id. at 902-03. Plaintiff was still experiencing flashbacks and insomnia at this time. Id. at 902. His goals included reducing anger and "readiness to change." Id. Plaintiff asked to be placed in a different group. Id. at 903.

On August 29, 2013, Plaintiff visited Gateway Medical Center for several MRI procedures. Id. at 875-82. Plaintiff's thoracic spine MRI showed a "[n]ormal CT of the thoracic spine." Id. Plaintiff's lumbar spine MRI that showed "mild multilevel facet arthritis" but "no spinal or foraminal stenosis." Id. at 877. Plaintiff's right knee MRI showed a "[s]prain or partial tear of the anterior cruciate ligament[; a s]mall joint effusion" but an "[o]therwise normal study." Id. at 879. Plaintiff's left knee MRI showed a "[s]mall joint effusion" but "[o]therwise, normal study." Id. at 881.

On September 3, 2013, Plaintiff visited the VA Hospital. Id. at 895-96. Plaintiff presented for a physical therapy consultation. Id. Plaintiff described his chronic lower back pain with pain at a constant six out of ten and stated that it was improved with "moist [heat] and TENS UNIT" to pain at a two out of ten. Id. at 896. Plaintiff was using a cane during this appointment. Id. Plaintiff was not scheduled for another physical therapy appointment, but it was recommended that he visit an outpatient facility. Id.

On September 3, 2013, Plaintiff also visited the mental health facility at the VA Hospital for medication management. Id. at 896-901. At the time, Plaintiff reported that his prescriptions for

zolpidem and an increased dose of fluoxetine were making him feel "peaceful." Id. at 898. Plaintiff

was still hypervigilant and continued to describe an exaggerated startle response. Id. Plaintiff also

stated that woke up at night due to pain. Id. Plaintiff reported that the PTSD clinic was "helpful,"

and denied knowledge of the VA polytrauma clinic having contacted him for a follow up. Id.

On September 4, 2013, Plaintiff visited The People's Clinic. Id. at 851-54. Plaintiff

presented for lower back pain that radiated to his left and right feet. Id. at 851. Plaintiff stated that

he needed a referral to return to CPC. Id. At this time, Plaintiff reported that he had taken Celebrex,

Gabapentin and Tramadol for pain with success, and Ambien for insomnia. Id. Plaintiff listed

fifteen medication that he was currently taking. Id. at 853. Plaintiff received a referral to CPC. Id.

at 854.

On September 5, 2013, Plaintiff had another initial evaluation with STAR Physical Therapy.

Id. at 992-97. Plaintiff reported "pain, stiffness and weakness" and that his right leg was in worse

condition than his left. Id. at 993. The treatment plan included twice a week visits for four weeks

and home treatment. Id. at 992.

On September 6, 2013, Plaintiff visited the VA Hospital. Id. at 895. Plaintiff presented for

a hearing evaluation. Id. At the time, he was using a hearing aid "issued to him while he was in the

military in 2008" but was "here today to pursue new amplification." Id. Plaintiff took a hearing test,

and the results showed "a decrease in hearing sensitivity." Id. New hearing aids were ordered for

Plaintiff. Id.

On September 9, 2013, Plaintiff visited STAR Physical Therapy. Id. at 990-91. Plaintiff has

no change in pain or soreness and reported compliance with his home treatment program. Id. at 990.

Plaintiff was "progressing well overall." Id. On September 11, 2013, Plaintiff returned to STAR

Physical Therapy. Id. at 988-89. Plaintiff "report[ed] that he has increased soreness" due to an injection procedure. Id. at 988.

On September 16, 2013, Plaintiff returned to STAR Physical Therapy. Id. at 986-87. Plaintiff "report[ed] walking has improved," and knee soreness following another injection procedure. Id. at 986. Plaintiff "needed less rest and [demonstrated] improved form showing strength is improving. [Plaintiff] was able to squat today with little pain for the first time in many weeks. [Plaintiff] progressing as expected." Id.

On September 18, 2013, Plaintiff returned to STAR Physical Therapy. Id. at 984-85. Plaintiff "report[ed] 5/10 pain" and "tolerated treatment well." Id. at 984. Plaintiff was "progressing toward achievement of treatment goals as expected." Id.

On September 23, 2013, Plaintiff visited STAR Physical Therapy. Id. at 982-83. Plaintiff "report[ed] noticing a sharp pain in his left knee during knee flexion that moves lateral to medial." Id. at 982. Plaintiff tolerated the treatment well. Id.

On September 25, 2013, Plaintiff returned to STAR Physical Therapy. Id. at 979-81. Plaintiff "report[ed] the pain intensity has decreased in his knees, but is still there most of the time." Id. at 979. Plaintiff "report[ed] partial compliance" with his home treatment. Id. On this visit, Plaintiff showed "improved ... strength" and was "making slow progress toward achieving treatment goals." Id. at 980.

On September 30, 2013, Plaintiff returned to STAR Physical Therapy. Id. at 977-78. Plaintiff "report[ed] his knees are feeling a little better" and "tolerated treatment well today." Id. at 977. Plaintiff was "making slow progress toward achieving treatment goals at this time." Id.

On October 1, 2013, Plaintiff visited the VA Hospital. Id. at 889-93. On this visit, Plaintiff's

many physical complaints were listed. The polytrauma consult entry states: "The Polytrauma Support Clinic has been asked to evaluate due to exposure to trauma, as outlined below. This is the Veteran's first time being seen for polytrauma. As you know, he is a 48-year-old male who was involved in military service and was thus exposed to several traumas. This Veteran's worst exposure was in 1999. It was a fall from a tank. He fell 4 feet and also injured his (R) thumb. He lost consciousness for a few seconds. He felt dazed for one minute. He had a headache for 2 days. He does not recall any dizziness or loss of balance. He does recall having tinnitus for a while afterward. He does not note any ongoing difficulties with memory after that exposure. He also mentions another fall from a helicopter, about 6 feet. He felt dazed for a few minutes but remembers the event and did not lose consciousness. He also lists 8 blast exposures. ... He received no real treatment on-site other than a cursory evaluation." Id. at 889-90. Dr. Bhaskar Mukherji concluded that Plaintiff did not have "post-concussion syndrome" because "the listed symptoms did not begin with the exposures and can be explained by the presence of a mental health condition, insomnia, chronic pain, and/or medication effects[.]" Id. at 893.

On October 2, 2013, Plaintiff visited STAR Physical Therapy. Id. at 975-76. Plaintiff "report[ed] his knees are feeling better." Id. at 975. Plaintiff showed progress on this visit, and was "progressing toward achievement of treatment goals as expected." Id.

On October 5, 2013, Plaintiff visited the CPC for a follow up. Id. at 958. Plaintiff reported that his pain level was improved and at a four out of ten and that his physical function was better. Id.

On October 15, 2013, Plaintiff visited STAR Physical Therapy. Id. at 973-74. Plaintiff "report[ed] [right] knee feeling better with minimal soreness now," but no improvement on his left

29

side. Id. at 973.

On October 24, 2013, Plaintiff returned to STAR Physical Therapy. Id. at 971-72. On this visit, Plaintiff "report[ed] [right] knee pain is now minimal and quad strength has improved on that side," but there was not improvement on the left side. Id. at 971. Plaintiff was more fatigued than usual on this visit. Id.

On October 28, 2013, Plaintiff visited STAR Physical Therapy. Id. at 968-70. Plaintiff reported "no significant change in pain/symptoms since the last visit. [Plaintiff] reports pain will be better for up to a day after therapy, then begins to hurt again." Id. at 968. Plaintiff "did not tolerate treatment well today" because of knee pain. Id. at 969. Plaintiff was showing some strength improvement, but in several areas did not improve at all. Id. The report concluded, "[f]unctionally he has not made much progress." Id.

On November 13, 2013, Plaintiff's claim was denied by the ALJ.

## B. Conclusions of Law

A "disability" is defined by the Social Security Act as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1); see also 42 U.S.C. § 1382c(a)(3). A reviewing court's evaluation of the Commissioner's decision is based upon the record made from the administrative hearing process. Jones v. Sec'y, Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991).

Judicial review is limited to determination of (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in

the process of reaching that decision. Landsaw v. Sec'y of Health and Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)).

Plaintiff contends that the ALJ erred by: (1) finding that Plaintiff was not disabled at step four; (2) finding that Plaintiff could maintain concentration, persistence, and pace for two hours at a time in the residual functional capacity assessment ("RFC"); (3) failing to include Plaintiff's need for a cane in the RFC; (4) finding that Plaintiff has the ability to stoop in the RFC; and (5) accepting the vocational expert's testimony. Plaintiff's first assignment of error, that the ALJ found him not disabled at step four, is interrelated to Plaintiff's other contentions and will be addressed in the analysis of those contentions.

Plaintiff's next contention is that the ALJ erred by finding in the RFC that Plaintiff "can maintain concentration, persistence, and pace for two hours at a time[.]" (Docket Entry No. 8, Administrative Record, at 24). When considering Plaintiff's impairments at step three, the ALJ found:

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. He indicated in a February 2013 function report that he did not know how long he could pay attention. He also indicated that his impairments affected his memory, concentration, and ability to complete tasks. However, he also told Dr. Cheah that he could manage his medications with little or no difficulty. Dr. Cheah determined in the psychological evaluation that he showed no impairment in short-term memory, long-term, and remote memory functioning. While the claimant might experience some limitation in concentration, persistence, and pace, the totality of the evidence supports no more than moderate difficulties in this domain.

Id. at 23.

The ALJ also cited Plaintiff's self-reported function report dated February 11, 2013 and a psychological evaluation dated November 20, 2012. Id. In the function report, Plaintiff stated that he does "need help or reminders taking medicine." Id. at 224. When asked which "of the following items [his] illness, injuries or conditions affect," Plaintiff specifically marked "concentration," "memory," and "completing tasks." Id. at 227. When asked "[f]or how long can you pay attention?" Plaintiff answered "don't know." Id. When asked "[d]o you finish what you start?" Plaintiff answered "no." Id. Plaintiff also listed side effects from his medication, and stated that Topamax caused him "difficulty with concentration." Id. at 229.

At his psychological evaluation, Plaintiff reported that "he has some problems with his short-term memory and concentration abilities. He reports that some typical examples of these difficulties include: 'I can't remember something if I read it or see it.'" Id. at 538. The psychologist concluded that Plaintiff "showed no evidence of short-term memory impairment," although Plaintiff "was able to recall only one of the three previously named objects after a three-minute delay." Id. at 539, 538. The psychologist also concluded that Plaintiff "showed evidence of mild impairment in his ability to sustain concentration" but "showed no evidence of impairment in his long-term and remote memory functioning." Id. at 539.

The Government contends that the findings of an ALJ at step three do not constitute an RFC. As stated by the SSA:

> The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess and individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3

of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

SSR 96-8p.

Thus, under SSR 96-8p, the ALJ's findings in step three do not establish an RFC and are not required to be reflected in the RFC. Collier v. Comm'r of Soc. Sec., 2013 WL 4539631 at *6 (W.D. Mich. Aug. 27, 2013) (RFC including ability to perform "simple, routine, and repetitive tasks" not inconsistent with paragraph B criteria). Here, the ALJ found that Plaintiff had a "moderate limitation" in concentration, persistence and pace, and later found that Plaintiff could concentrate, persist and pace himself for two hours at a time, a normal workday schedule. See Bigham v. Comm'r of Soc. Sec., 2015 WL 5385912 at *3 (N.D. Ohio Sept. 14, 2015) ("... standard two, fifteen-minute breaks (plus a lunch break) during the workday.") and Bohannon v. Colvin, 2015 WL 5018730 at *6 (N.D. Ohio Aug. 20, 2015) ("... typically provided of a morning break, lunch break and afternoon break.").

Although step three findings do not establish an RFC, an ALJ must be consistent in her findings. Plaintiff's reports reflect his difficulties with concentration, persistence and pace. Additionally, Plaintiff's mental status examination dated September 3, 2013 and referenced by the ALJ describes Plaintiff's "attention/concentration" as "fair." (Docket Entry No. 8 at 27, 900). The Court concludes that because Plaintiff's medical records reflect Plaintiff's limited concentration, persistence and pace, an RFC that states Plaintiff "can maintain concentration, persistence and pace" and participate in a normal workday is not a reasonable finding.

Plaintiff next asserts that the ALJ erred by failing to state that Plaintiff requires a cane in the

RFC and in the ALJ's questions to the vocational expert. Plaintiff asserts that he requires the cane to stand as well as to walk. As such, Plaintiff contends that he cannot perform the jobs listed by the vocational expert that require extensive use of both hands.

At the hearing, when asked "[h]ow often do you use the cane," Plaintiff answered "[i]t's part of my body already, so I can do nothing without my cane because the reason it was prescribed is because I'm, my balance, because of support of my knees and my back as well when I walking, so that's why I got a cane prescribed to support." Id. at 44. Plaintiff's medical records, however, do not reflect that Plaintiff requires the cane to stand. Accordingly, the Court concludes that the substantial medical evidence does not support Plaintiff's requirement of a cane to stand.

Plaintiff next contends that the ALJ erred by failing to specify Plaintiff's ability to stoop. Under Social Security Regulation 96-8p "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." The assessment of physical abilities includes "sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)." 20 CFR 404.1545(b). The ALJ's RFC findings included restrictions for sitting, standing, walking, lifting, pushing, pulling and carrying, but not balancing, stooping, kneeling, crouching, crawling, and climbing. (Docket Entry No. 8 at 23-24).

"'Although a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing,' as there is a difference 'between what an ALJ must

consider and what an ALJ must discuss in a written opinion.'" Burke v. Comm'r of Soc. Sec., 2014 WL 2895460 at *10 (E.D. Tenn. June 25, 2014) (quoting Delgado v. Comm'r of Soc. Sec., 30 Fed. Appx. 542, 547 (6th Cir. 2002)).

Plaintiff testified at the hearing that he could not squat, bend or kneel. (Docket Entry No. 8, Administrative Record, at 43). Yet, the ALJ found this claim to lack credibility. Id. at 27-29. The ALJ cites three medical records on the condition of Plaintiff's lumbar spine. The first, a radiologic examination report dated February 23, 2013, found "[n]o evidence of disc desiccation or tears of annulus fibrosis," but did find "mild neuroforaminal narrowing secondary to facet joint sclerosis and ligamentum flavum hypertrophy [that is] not significantly changed from comparison study." Id. at 710-11.

The second record from the Clarksville Pain Clinic dated October 5, 2013, describes a sacroiliac joint injection procedure. Id. at 958. The ALJ also found that "[Plaintiff] was effectively treated with sacroiliac joint injections in June 2013, also" supported the determination that Plaintiff's claims are not credible. Id. at 28. Yet, Plaintiff's initial injections were apparently not successful, as Plaintiff received sacroiliac joint injections on October 3, 2011, April 24, 2013, June 7, 2013, June 14, 2013, and again on September 11, 2013. Id. at 297, 833, 962, 961, 988, 986. The frequency of these injections implies these injections have limited effectiveness. The Court concludes that the ALJ was mistaken in finding that one of these injections "effectively treated" Plaintiff, rendering his claims incredible.

The third medical record cited by the ALJ is an MRI report dated August 29, 2013 that reveals normal "[a]lignment and bone marrow signal" and "intervertebral disks." Id. at 875-78. Yet this MRI also found "mild facet arthritis at all 5 levels."

An ALJ is entitled to make credibility determinations regarding the Plaintiff's testimony about his limitations:

> It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.
> ...
> Social Security Ruling 96-7p also requires the ALJ explain his credibility determinations in his decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence.

Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 247-48 (6th Cir. 2007).

The Court concludes that the medical records cited by the ALJ do not establish a basis for refusing to credit Plaintiff's pain testimony. Plaintiff's cited medical records reflect physical problems consistent with Plaintiff's testimony about his limitations. Plaintiff's medical records reflect that his medical providers deemed Plaintiff's complaints credible.

The ALJ also found that "[t]here is no evidence in the record to explain the claimant's sudden disability. Although he mentioned a prior work injury as the cause of some of his impairments, this injury is remote in time. The evidence shows that he continued to work." (Docket Entry No. 8 at 28). Yet, as early as January 25, 2012, Plaintiff's commander stated that Plaintiff was not fit for his work. Id. at 144-46. Plaintiff's commander wrote, "[s]oldier's medical conditions/limitations affect unit accomplishing mission," "I do not recommend retaining this Soldier: SM is [severely] limited by his physical capabilities." Id. at 146. On August 6, 2012, proceedings were held by the United States Army Physical Disability Agency's Physical Evaluation Board ("PEB"). Id. at 147-57. The PEB concluded that "[Plaintiff was] physically unfit and recommend[ed] a rating of 80% and that

36

the [Plaintiff's] disposition be placed on [Temporary Disability Retirement List] and with a reexamination during 07/2013." Id. at 147.

On September 12, 2012, Plaintiff's supervisor stated that Plaintiff could not "complete all the usual duties required for [his] position," was not "able to complete all of the job duties without special assistance" and could not "complete [his] work in the same amount of time as employees in similar positions." Id. at 163. Plaintiff's supervisor stated that Plaintiff had a productivity level of "50% or less of other employees' productivity." Id. at 164.

On September 13, 2012, Plaintiff completed a work activity report for SSA. Id. at 179-90. Plaintiff wrote that he was "required to call in only for accountability purposes" but was not "required to go to work." Id. at 187. Plaintiff reported income from the Army is "pending results of a medical review board." Id.

At the hearing, Plaintiff stated that "since in January 2012 my unit just sent me home [from active duty]. I be keeping in touch, I was keeping in touch with my unit on a daily basis. Calling my supervisor and letting him know that I was okay. But my last time that I was active working in the Army was January 2012. So I spent probably a year and some months just sitting in my house waiting for the decision with the Army." Id. at 57. The ALJ then asked Plaintiff's attorney why Plaintiff showed income in 2013. According to Plaintiff's attorney, "[t]hat would work the same way as if somebody were on a medical leave and was receiving passive income out of the goodness of their employer's heart." Id.

This testimony reflects that Plaintiff did not continue to work after his onset date of disability in January 2012. As to continuing to work after his initial "work injury" – that is, an injury sustained while deployed in Iraq – Plaintiff testified to this at the hearing as well. Plaintiff stated, "I was

aviation mechanic. I used to work on helicopters. So after my Army, that was 2008, 2007, after that deployment they didn't mind that I was hurting physically, they find a position for me and they made me the housing manager for all the barracks and all the soldiers. That was a new position, they call Barracks First Sergeant. That was the S-40 NCOIC, so basically I was doing administrator jobs because I cannot clean or jump on aircraft no more so that's why that position coming about, sir." Id. at 58.

The Court concludes that the ALJ lacked sufficient basis for finding Plaintiff's claims of physical disability incredible. Plaintiff's cited records reflect a physical injury or illness that his medical providers found credible; and the ALJ's assertion that Plaintiff continued to work is belied by the numerous reports from Plaintiff's supervisors and the PEB that Plaintiff was unfit for continued work.

The ALJ also found Plaintiff's claims of mental disorder incredible:

His activities of daily living contradict his allegations of disabling symptoms related to posttraumatic stress disorder. The facts demonstrate that he is quite capable of functioning independently outside of the area of his home. While the claimant was a part of a convoy in the military, he was never in the infantry.

Id. at 29.

Plaintiff's mental health records reflect a diagnosis of PTSD. Id. at 716-25. In the section for occupational and social impairment, Plaintiff was marked as "[o]ccupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood." Id. at 719. This is the second-highest level of impairment, just below "[t]otal occupational and social impairment." Id. Plaintiff reported that he "[did] not think the medicine is helping" and that he "is worried about his relationship with his family." Id. at 721. The

38

report lists eighteen symptoms associated with PTSD and experienced by Plaintiff. Id. at 724-25. On August 6, 2012, the PEB found Plaintiff's PTSD diagnosis to be "appropriate" and that it "requires ongoing psychotropic medication." Id. The PEB found that this condition made Plaintiff unfit "because it renders the [Plaintiff] unable to reasonably continue military service due to irritability, depressed mood, anxiety, panic attacks, sleep difficulty, avoidance symptoms, hypervigilance, and exaggerated startle response." Id.

On February 4, 2013, Plaintiff completed a disability report for appeal. Id. at 206-13. Plaintiff wrote "[i]t's like I have been condemned to a suffering leaving, the pleasure of doing things like I used to or hanging in places with my family is no longer there. Some times bad thoughts invade my main and make change from a peaceful stage to a very ungraceful one causing discomfort to my closed family members. I'm willing to do my best in way to better myself, but some times I think could be there no been here no more instead of being begging for help to support myself." Id. at 207. These reports demonstrate that Plaintiff experiences severe symptoms of PTSD. Further, there is not any evidence that Plaintiff "is quite capable of functioning independently outside of the area of his home."

The ALJ specifically mentioned that Plaintiff sings in the choir at church and accompanies his wife to Walmart. Regarding the choir, Plaintiff testified at the hearing that it "allow[s him] to sit and stand. Kind of hard to be sitting for the whole mass period of time, 45 minutes, an hour. So be part of that, allow me to be standing whenever I feel like, sitting when I need to." Id. at 53. Plaintiff testified that he did not practice on other days of the week and did not stay before or after mass; simply attended "every Sunday." Id. at 53-54. As to Plaintiff's hypervigilance and fear of crowds, Plaintiff testified that in the choir he is allowed to be "against the wall and the last person

on the choir." Id. at 54.

Regarding the trips to Walmart with his wife, Plaintiff testified that he could not complete them and he can only "walk for probably a couple of minutes and find a place to sit down and let her do all the shopping." Id. at 55. Plaintiff also explained these trips with his wife to be part of his PTSD treatment. Plaintiff stated, "[t]he VA wants her to take me, her to take me around whenever she goes, not leave me by myself in the house, especially when my kids aren't in school." Id.

Given these findings, the Court concludes that the substantial evidence is contrary to the ALJ's determination on Plaintiff's mental condition. The record reflects that Plaintiff has been diagnosed and treated for PTSD and experiences symptoms of PTSD. The ALJ's reliance on Plaintiff's once a week trip to church and participation in the choir, and his accompaniment to Walmart that is encouraged by the VA is misplaced.

Plaintiff's next contention is that the ALJ erred by failing to obtain a reasonable explanation from the vocation expert on a conflict between the vocational expert's testimony and the Dictionary of Occupational Titles. Plaintiff concedes that "the ALJ fulfilled her 'affirmative responsibility' to ask the vocational expert whether his testimony was consistent with the DOT." (Docket Entry No. 18 at 17). The ALJ did ask whether the vocational expert's "testimony [was] consistent with the DOT" and the vocational expert answered that it was. (Docket Entry No. 8 at 61). Plaintiff did not object to this answer.

As to any conflict between the vocational expert's testimony and the Dictionary of Occupational Title, "[t]he SSR 00-4p does not address what to do when a conflict is not apparent." Martin v. Comm'r of Soc. Sec., 170 Fed. Appx. 369, 374 (6th Cir. 2006). At the hearing, neither Plaintiff nor Plaintiff's attorney raised any conflict between the vocational expert's claims and the

Dictionary of Occupational Titles.

> Consistent with the SSR 00-4p, the ALJ asked if there was a conflict. The vocational expert testified that there was not. [Plaintiff] did not bring the vocational expert's mistake to the ALJ's attention. Nothing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct. Futhermore, even if there is a conflict between the expert's testimony and the DOT, 'neither the DOT or [the expert's testimony] automatically trumps when there is a conflict.' ... Because [Plaintiff] did not bring the conflict to the attention of the ALJ, the ALJ did not need to explain how the conflict was resolved. Here, the ALJ specifically asked if there was a conflict and the uncontradicted testimony of the vocational expert indicated that no conflict existed.

Id. (citing SSR 00-4p). Plaintiff's contention lacks merit.

For these reasons, the Court concludes that the ALJ's decision is not supported by substantial evidence and Plaintiff's application should be remanded for further proceedings consistent with this Memorandum.

An appropriate Order is filed herewith.

**ENTERED** this the _20_ day of January, 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge